Mark McKAY, Appellant,

v.

STATE of Alaska, Appellee.

No. 1284.

Supreme Court of Alaska.

Oct. 1, 1971.

Victor D. Carlson, Public Defender, James D. Gilmore, Michael L. Rubinstein, Asst. Public Defenders, Anchorage, for appellant.

G. Kent Edwards, Atty. Gen., Juneau, Harold W. Tobey, Dist. Atty., Robert L. Eastaugh, Asst. Dist. Atty., Anchorage, for appellee.

Before BONEY, C. J., and DIMOND, RABINOWITZ, CONNOR and ERWIN, JJ.

CONNOR, Justice.

In June of 1969 Kenneth Foster was employed by the Anchorage Police Department to work as an undercover narcotics agent. His assignment was to get to know persons in the area who were selling drugs or who were in contact with persons who sold drugs. Foster was told to make as many buys from as many different people as he could. Foster was introduced by an informant to a group of young people who were suspected of being involved in drug use and sales.

In order to gain the trust of these people, Foster told them he was a drug dealer from Los Angeles. He told them he was expecting a shipment of some fifty "keys" (kilos) of marijuana and was looking for local people to help him sell it. Foster asked one of the young men of the group where he could get some heroin, and on July 8, 1969, he was taken to the Q & 8 Billiard Parlor and introduced to Mark McKay.

Upon asking McKay for heroin, Foster was informed by McKay that heroin was available from a dealer named Maurice, but that Maurice would deal only through McKay. There was also some testimony that Foster had told the group that he had a friend who would be going to the North Slope soon and who was "strung out" on heroin; that is, the friend was addicted and needed the drug quite badly. Mark McKay testified that Foster had told him about this friend.

McKay told Foster the price of heroin would be $25.00. Foster gave McKay $25.00 cash, and saw McKay walk over to a man who Foster later found out was Maurice. He observed an exchange between McKay and Maurice, after which McKay came over and handed Foster a slip of heroin.

On July 10, 1969, Foster was again in the Q & 8 Billiard Parlor. On this evening, he approached McKay and asked what

he was selling. McKay stated he was selling hashish (a marijuana derivative) for $8.00 per gram. Foster thereupon purchased a quantity of hashish from McKay for $8.00, and observed McKay hand some money to another man. Foster believed it was the same $8.00.

Foster made a third purchase from McKay on July 16, 1969, also at the Q & 8 Billiard Parlor. Prior to July 16, 1969, Foster had asked McKay several times about the possibility of getting heroin. McKay had informed him that Maurice had not been in the Q & 8 recently. On the evening of July 16, 1969, however McKay approached Foster and asked him if he was still interested in purchasing some heroin. Maurice had been "busted" and McKay was short of money. McKay stated he wanted to make this sale himself. Foster agreed after checking with his immediate supervisor. Foster purchased a slip of heroin from McKay later that evening for $20.00.

Toward the end of September 1969, it became apparent that Foster's true identity was about to be discovered. Therefore, when the grand jury convened on September 25, 1969, Foster testified in some 22 cases involving drug purchases, including Mark McKay's case. McKay was indicted by the grand jury on three counts, each count relating to one of the three sales described above.[1]

Following a trial by jury, McKay was convicted on all three counts. Count I, which charged McKay with the July 8, 1969, sale involving Maurice was later dismissed by the trial court on the ground that McKay did not actually sell the drug to Foster, but was acting as Foster's purchasing agent in the transaction. An appeal was taken by McKay from the convictions on Counts II and III.

I

Appellant first contends that the trial court erred in denying his application to inspect the minutes of Kenneth Foster's testimony before the grand jury. During the cross-examination of Kenneth Foster, McKay's counsel asked the court for permission to inspect the grand jury's minutes of Foster's testimony, stating, "[T]here's a possibility that there is a discrepancy between what was testified to before the Grand Jury and what may have been testified to today." The trial court denied the application.

Following oral argument on the appeal, we ordered the record in this case to be supplemented. The supplemental record indicates that the minutes that were recorded by the grand jury contain only the names of the witnesses who testified. There were no notations of the content of any testimony.

Rule 6(g) of the Alaska Rules of Criminal Procedure sets forth who may be present at grand jury proceedings as follows:

> "The prosecuting attorney, the witness under examination, interpreters when needed and, *for the purpose of taking the evidence, a stenographer may be present* while the grand jury is in session, but no person other than the jurors may be present while the grand jury is deliberating or voting." (Emphasis added.)

The language above quoted with respect to the presence of a stenographer for recording testimony is clearly permissive and not mandatory. Further, there is no provision or rule at the present time requiring that

---

1. Counts I and II charged McKay with having violated AS 17.10.010, which provides:
   "It is unlawful for any person to manufacture, possess, have under his control, sell, prescribe, administer, dispense, give, barter, supply or distribute in any manner, or compound any narcotic drug except as authorized in this chapter."

Count III charged McKay with a violation of AS 17.12.010 which provides:
   "Except as otherwise provided in this chapter, it is unlawful for a person to manufacture, compound, counterfeit, possess, have under his control, sell, prescribe, administer, dispense, give, barter, supply or distribute in any manner, a depressant, hallucinogenic or stimulant drug."

grand jury proceedings be recorded or preserved in any manner.

Since it appears that the McKay grand jury proceedings were not preserved, appellant could not have gained any knowledge of Foster's grand jury testimony from an inspection of the minutes under any circumstances. We thus need not decide whether appellant made a showing of particularized need as required by our decision in Merrill v. State, 423 P.2d 686 (Alaska 1967), cert. denied, 382 U.S. 1020, 86 S.Ct. 640, 15 L.Ed.2d 534 (1966) and 386 U.S. 1040, 87 S.Ct. 1497, 18 L.Ed.2d 607 (1967), since the fact that the grand jury minutes did not contain notes of the content of Foster's testimony renders this issue moot.

## II

█ Lyle Standiford was one of the group of young people with whom Kenneth Foster made acquaintance for the purpose of gaining entry into Anchorage's community of drug users and sellers. According to Foster's testimony, Lyle Standiford was present in the Q & 8 when the first heroin sale occurred on July 8, 1969. Foster also testified that on July 16, 1969, at the second heroin transaction, Mark McKay handed the slip of heroin that Foster purchased to Standiford, who in turn handed it over to Foster.

Standiford, testifying on behalf of Mark McKay, denied that he had seen or participated in any drug transactions between McKay and Foster. Before cross-examining Standiford, the prosecutor asked permission of the court to ask Standiford whether he had been indicted. Over objection, the court permitted the state's attorney to ask the following question:

"Q. [By Mr. Burke]: Mr. Standiford, isn't it correct that at the present time,

sir, you yourself are a defendant under charges arising out of the undercover work of Mr. Kenneth Foster, the complaining witness?"

Mr. Standiford answered that he was.

Appellant claims that an inquiry into whether a witness is presently under indictment is improper impeachment, since it asks for evidence of a particular wrongful act.[2] Because the primary purpose of the cross-examination was to show that Lyle Standiford might be biased or interested in the outcome of McKay's case, we think the inquiry was proper.

We discussed this point in Smith v. State, 431 P.2d 507, 509 (Alaska 1967) as follows:

"The question thus arises as to whether evidence is admissible where on the one hand it serves a legitimate purpose and on the other hand tends to accomplish that which is forbidden. We believe that the answer depends upon an advised judgment as to which of the two objectives is the primary one sought to be accomplished."

In *Smith*, two defense witnesses were cross-examined concerning their operation, along with the defendant, of an alleged gambling house. We held the cross-examination complained of in that case was primarily for the purpose of attempting to show that the two witnesses were engaged in a business enterprise as partners of the defendant. Thus, the jury could easily have inferred that they had friendly feelings toward the defendant and might therefore slant their testimony in his favor. We also noted that the cross-examination was limited to whether the witnesses conduced the business, and sought only to elicit the nature of their relationship with the defendant.

2. Rule 26(a) of the Alaska Rules of Criminal Procedure states in part:
   "The admissibility of evidence shall be governed by Civil Rule 43 * * *."
   Rule 43(g) (11) [b] of the Alaska Rules of Civil Procedure provides:
   "A witness may be impeached by the party against whom he was called by contradictory evidence, or by evidence that his general reputation for truth is bad, or that his moral character is such as to render him unworthy of belief. He may not be impeached by evidence of particular wrongful acts, except that it may be shown by the examination of the witness or the record of a judgment that he has been convicted of a crime."

In the case before us, Lyle Standiford was under indictment for selling drugs to Kenneth Foster. Standiford also was acquainted with Mark McKay. From these facts the jury could certainly find that Lyle Standiford had friendly feelings toward Mark McKay. Further, it is possible that Standiford hoped that if he could successfully discredit Foster in McKay's case, the state might view his own case as having been substantially weakened from the prosecution's viewpoint.

Finally, the state here did not attempt to inquire at all into the circumstances surrounding Standiford's indictment. The scope of the inquiry was limited to bringing out the basis for the possible bias or interest. We therefore hold that the cross-examination above quoted was proper, as it appears that the primary purpose was to show Standiford's possible bias or interest in the outcome of the case.[3]

### III

■ McKay next argues that his motion for judgment of acquittal should have been granted on the ground that appellant had been entrapped by the conduct of the police agent, Kenneth Foster. Appellant first points to the fact that Foster, a 29-year-old man, represented himself to this group of young persons as a "big man in narcotics." With respect to the fictional shipment of marijuana, Foster specifically offered Mark McKay a fifty-fifty split of the profits if McKay would help him sell it. Foster testified that fifty kilos of marijuana was worth $10,000, but failed to indicate whether this figure represented the wholesale value, retail value, or the net profits to be gained.

Appellant also argues that Foster's story about his "strung out" friend on the North Slope was a plea to McKay's sympathy, and that in response to that plea, McKay procured heroin for Foster.

In Grossman v. State, 457 P.2d 226 (Alaska 1969), we adopted the objective test for entrapment:

"[U]nlawful entrapment occurs when a public law enforcement official, or a person working in cooperation with him, in order to obtain evidence of the commission of an offense, induces another person to commit such an offense by persuasion or inducement which would be effective to persuade an average person, other than one who is ready and willing, to commit such an offense. Conversely, instigations which would induce only a person engaged in an habitual course of unlawful conduct for gain or profit do not constitute entrapment." 457 P.2d, at 229.

Kenneth Foster met Mark McKay for the first time on July 8, 1969, at which time McKay procured from Maurice a slip of heroin for Foster. Although McKay testified that Foster had mentioned this "strung out" friend on the North Slope on July 8, 1969, it does not appear that Foster emphasized this further.[4]

Also, there is nothing in the record to indicate that the profits Foster offered with respect to the sale of the fifty kilos of marijuana were at all inordinate for the sale of that drug. Drug sales are commonly known to yield large profits, yet the average citizen has apparently not been persuaded to engage in illicit drug sales. In any event, the promise of the profits on the marijuana deal was not at all conditioned upon McKay's procuring the heroin from Maurice or upon his making the two subsequent drug sales. A strong inference

3. Whitton v. State, 479 P.2d 302, 316–317 (Alaska 1970); Estate v. Metcalf, 203 Kan. 63, 452 P.2d 842, 845 (1969); 3 A. Wigmore, Evidence, § 949 at 790 (Chadbourn rev. 1970).

4. Cf., United States v. Sawyer, 210 F.2d 169, 170 (3rd Cir. 1954), wherein the police agent, in order to persuade defendant to obtain some heroin for him, stopped defendant on the street and, "feigned a dramatic and violent seizure and begged Sawyer to get him something to relieve his distress." There the court found it to be error for the trial court to refuse an instruction on entrapment. The distinction between this case and the one at bar is patent.

could therefore have been drawn that Mark McKay was ready and willing to engage in the drug transactions wholly independent of Foster's pleas to his humanitarian and pecuniary motives. There was no error on this point.

## IV

Kenneth Foster testified that he made drug purchases from Mark McKay on July 8, 10, and 16, 1969. McKay was indicted on September 25, 1969. Appellant argues that the time between the acts charged and the indictment was unreasonable and constituted a denial of due process in that the delay was purposeful, unjustifiable, and prejudiced his ability to prepare a defense. Appellant maintains that the case of Ross v. United States, 121 U.S.App.D.C. 233, 349 F.2d 210 (1965) and the line of cases following Ross[5] require a reversal of his case. We disagree.[6]

Ross, like this case, involved the sale of illegal drugs to a police undercover agent. There the court found that a seven month interval from the alleged drug sale until arrest was an unreasonable delay denying appellant due process. The court in Ross specifically recognized a valid law enforcement need to use undercover drug agents to administer the drug sale prohibitions efficiently and effectively. In many instances, it takes an agent some time to establish himself in a position of trust in the drug community. Once this position has been established, the police naturally hope that the agent can make as many illicit drug purchases as possible before he "blows his cover" either by accident or when all of his cases are brought before the grand jury.

The court in Ross balanced this state interest with the defendant's interest in having formal charges made soon after the alleged offense. Obviously, the shorter the time lapse, the easier it will be for the defendant to recollect and reconstruct the events of the day in question, and otherwise gather evidence for his defense. Further, as the District of Columbia Court of Appeals emphasized both in Ross and in its later decision in Woody v. United States,[7] where the circumstances surrounding the drug transaction render the identification of the defendant unreliable, the disabilities inherent in a long delay between the date of the offense and the formal charge become manifestly prejudicial to the defendant.

We believe Ross is distinguishable from the case at bar on several bases. Most obvious, of course, is the difference between seven months' delay in Ross and somewhat less than two and one-half months between McKay's third alleged sale and his indictment. On the issue of the reliability of the agent's identification of the defendant, the distinction between our case and Ross is striking.

In Ross, the agent had made a total of 125 purchases over a seven month period. The agent made only one purchase from Ross, and had no recollection of Ross or of the alleged transaction except as refreshed by notes he took at the time. In our case, however, Foster made three purchases on separate occasions from McKay in a well-lighted pool hall. The total number of cases that Foster made that summer did not exceed 25. Further, Foster saw McKay several times after the three transactions, and testified specifically that he had an inde-

5. Woody v. United States, 125 U.S.App. D.C. 192, 370 F.2d 214 (1966) ; United States v. Godfrey, 243 F.Supp. 830 (D.D. C.1965), aff'd per curiam, 123 U.S.App. D.C. 219, 358 F.2d 850 (1966) ; United States v. Curry, 284 F.Supp. 458 (N.D. Ill.1968) ; People v. Hernandez, 166 N.W. 2d 281 (Mich.App.1968).

6. Appellant has also raised the issue of whether the pre-indictment delay violated his right to speedy trial under the Sixth

Amendment of the United States Constitution and Article I, § 11 of the Alaska Constitution. This court has never decided the question of whether the relevant period for purposes of speedy trial should include the period between offense and formal charge, and we do not reach that question in this case.

7. 125 U.S.App.D.C. 192, 370 F.2d 214 (1966).

pendent recollection of many of the details of the sales, although he did rely to some extent on notes.[8]

In *Ross,* there was no evidence corroborating any of the police agent's testimony. Both Mark McKay and Lyle Standiford, however, testified that they had met Foster in the Q & 8 on several occasions, although they did not remember the exact dates. The major difference between their version of the encounters and Foster's version was that McKay and Standiford denied that any drug sales occurred.

Some delay between offense and formal charge is clearly justified in cases involving drug undercover agents, and appellant here has not shown that the delay in his case was oppressive or unreasonable, or that he was prejudiced either in the preparation of his defense or because of an unreliable identification.

The identification by Foster was not made in sole reliance on the written reports he made following each transaction, but was based on several weeks of personal contacts with McKay. Further, McKay himself was able to testify with some particularity concerning certain encounters he had with Foster at the Q & 8. Appellant's reliance on *Ross* is misplaced. We hold that the delay between the acts alleged and the formal indictment in this case did not violate due process.[9]

## V

Appellant next claims that his convictions must be reversed on the ground that AS 17.10.010, AS 17.10.230(9), AS 17.12.010 and AS 17.10.150(7) deny him due process in that they are so vague as not to afford him fair warning of what is prohibited.

AS 17.10.230(9) defines what constitutes a "sale" of a narcotic in AS 17.10.010 [10] and provides:

" 'sale' includes barter, exchange, or gift, or offer therefor, and each such transaction made by any person, whether as principal, proprietor, agent, servant, or employee;"

AS 17.12.150(7) defines what is "sale" under AS 17.12.010,[11] as follows:

" 'sale' includes barter, exchange, gift, or offer for one of these, made by any person, whether as principal, proprietor, agent, servant, or employee."

Appellant states first that under the above definitions a person could conceivably be convicted of a sale although he is acting as an agent for a purchaser. Appellant next points out that there is a split of authority among the jurisdictions having statutory definitions of "sale" substantially similar to Alaska's as to whether "sale" includes transactions by an agent of a purchaser. Because the definition of "sale" in the two sections is subject to two dif-

---

8. *Cf.* Woody v. United States, 125 U.S. App.D.C. 192, 370 F.2d 214 (1966), wherein a single drug sale took place on a crowded, poorly lighted sidewalk. Further, in *Woody*, defendant had a two-inch facial scar which the agent failed to include in his notes describing the seller, all of which rendered the identification questionable. *But see,* State v. Rountree, 106 N.J.Super. 135, 254 A.2d 337 (1962), where the court held that the unreliability of the identification was irrelevant to the inquiry of prejudicial pre-indictment delay.

9. *See* United States v. Brooks, 422 F.2d 367 (9th Cir. 1970) (upholding a delay of four months) ; Jordan v. United States, 416 F.2d 338 (9th Cir. 1969) (upholding a delay of three months where only prejudice shown was that the defendants could not recall details of the days in the distant past; no special circumstances), cert. denied, 397 U.S. 920, 90 S.Ct. 930, 25 L.Ed.2d 101 (1970) ; Whitted v. United States, 411 F.2d 107 (9th Cir. 1969) (upholding a delay of six months), cert. denied, 399 U.S. 911, 90 S.Ct. 224, 26 L.Ed.2d 565 (1970) ; Wilson v. United States, 409 F.2d 184 (9th Cir. 1969) (upholding a delay of seven months), cert. denied, 395 U.S. 983, 89 S.Ct. 2146, 23 L.Ed.2d 771 (1969). All of these cases distinguished *Ross* and *Woody.*

10. Set out in n. 1, *supra.*

11. Set out in n. 1, *supra.*

ferent interpretations and because these statutes have never been interpreted by this court, appellant argues that he had to speculate as to the meaning of "sale." This argument has no merit.

In Harris v. State, 457 P.2d 638, 647 (Alaska 1969), we stated:

"[W]here the conduct to be prohibited by a criminal statute is capable of objective definition by language descriptive of precise physical acts and events, it simply will not do to use language so ambiguous as to be capable of expansion or contraction at the whim of the reader."

Applying that standard in this case, we cannot state that the statutes are void for vagueness.

These definitions of "sale" expressly include "agents." A person of common intelligence reading these definitions might well understand them as including an agent of a purchaser as well as an agent of a seller, particularly in light of the obvious expansion in the definitions of the concept of "sale" as it is commonly used in a commercial context. The fact that some courts might judicially construe the definition of "sale" in such a way as to narrow its scope to exclude purchasers' agents hardly renders the entire definition unconstitutionally vague. Hanby v. State, 479 P.2d 486, 500 (Alaska 1970).

## VI

■ Appellant cites as error the trial court's refusal to give the following instruction to the jury:

"With respect to Count [I, II, III]:

If you believe that the undercover police officer, Kenneth Foster, asked the defendant on the date in question to get some [heroin, marijuana] for him and thereupon the defendant undertook to act in the prospective purchaser's behalf

rather than his own, and in so doing purchased the drug from a third person with whom he was not associated in selling and distributing, and thereafter delivered it to the buyer, Kenneth Foster, the defendant would not be a seller and could not be convicted under this indictment."

First, it should be noted that Count I was dismissed and is not before us on appeal. Second, the circumstances of the transaction charged in Count II clearly do not raise an inference that Mark McKay purchased the heroin from a third person and thereafter delivered it to Foster, acting only on Foster's, and not on his own behalf. The record indicates that McKay told Foster he was short of money and would himself like to make the sale of heroin to Foster.

As to the sale of the hashish (Count III), the only testimony that might raise such an inference is the testimony of Foster that he saw McKay hand some money to another person after the transaction, and that he thought it might be the same money he had given McKay in exchange for the hashish. McKay apparently had had the hashish in his pocket at all times, even before Foster asked if he was selling anything. The more likely inference as to this transaction is that McKay was possibly acting as this other person's agent, rather than as Foster's agent.

Several jurisdictions with the Uniform Narcotic Drug Act (and consequently a similar definition of "sale") have held that an agent of a purchaser cannot be convicted of a "sale" of a prohibited drug under the Act.[12] We believe the courts that have rejected this "purchasing agent" doctrine have more accurately reflected the probable legislative intent underlying the rather expansive definition of "sale" contained in the Uniform Narcotic Drug Act. As the Illinois Supreme Court stated in

---

12. Commonwealth v. Harvard, 356 Mass. 452, 253 N.E.2d 346 (1969); People v. Fortes, 24 A.D.2d 428, 260 N.Y.S.2d 716 (1965); Jones v. State, 481 P.2d 169 (Okl.Cr.App.1971); Smith v. State, 396 S.W.2d 876 (Tex.Cr.App.1965).

People v. Shannon, 15 Ill.2d 494, 155 N.E. 2d 578, 580 (1959):

"We interpret the meaning of the word 'sale', as defined by the act, to be much broader in scope than that usually given to it in other branches of the law. Admittedly, the defendant took the role of at least an agent, and the act specifically declares an agent in a narcotics transaction to be a seller. We are of the opinion that the definition shows a legislative intent that the act of a person whether as agent, either for the seller or the purchaser, or as a go-between in such a transaction constitutes a sale." [13]

We therefore hold there was no error in refusing the requested instruction.

## VII

■ Finally, appellant contends that the trial judge erred by permitting the jury to consider the evidence concerning Count I, which was later dismissed following a verdict of guilty, because such considera-tion adversely affected their consideration of Counts II and III. This final contention has no merit.

Each count charges appellant with a separate offense. Different facts make up the charges for each count. In addition, the trial court gave the following instruction in this regard:

"The defendant is charged with a separate crime in each count of the indictment. Each crime and the evidence pertaining to it should be considered separately by the jury, and a separate verdict should be returned as to each count. Defendant's guilt or innocence of the crime charged in one count should not affect the jury's verdict on any other count. If the jury finds that the defendant is guilty beyond a reasonable doubt of any one of the crimes charged in the indictment, a verdict of guilty as to that count should be returned."

There was no error on this point.

Affirmed.

13. *See also*, People v. Abbott, 110 Ill.App. 2d 462, 249 N.E.2d 675 (1969), cert. de-nied, 398 U.S. 940, 90 S.Ct. 1851, 26 L.Ed. 2d 275 (1970); State v. Dwyer, 172 N.W.2d 591 (N.D.1969); State v. Weissman, 73 N.J.Super. 274, 179 A.2d 748 (1962); Annot., 93 A.L.R.2d 1001 (1964).