**Robert F. LUPRO, Appellant,**

v.

**·STATE of Alaska, Appellee.**

**No. 2987.**

Supreme Court of Alaska.

Nov. 9, 1979.

William F. Brattain, II, Fairbanks, for appellant.

Anne Carpeneti, Asst. Atty. Gen., Daniel W. Hickey, Chief Prosecutor, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, CONNOR, BURKE and MATTHEWS, JJ., and ROWLAND, J. [sitting as supreme court justice].

## OPINION

MATTHEWS, Justice.

Robert Lupro appeals from a conviction on both counts of a two-count indictment charging him with the crimes of negligent homicide and failure to render assistance to an injured person. He contends that the trial court used an incorrect standard in determining that he was culpably negligent

in causing the death of the decedent, Elmer Jacobsen, that evidence was admitted at trial that was improperly seized in violation of his right to protection from unreasonable searches and seizures, that the trial court permitted improper challenges for cause to veniremen who had been accused or convicted of offenses against the state, and that the trial court allowed improper impeachment of his alibi witness by admitting evidence of the witness' heroin usage and other "bad acts." Following a three week jury trial Lupro was found guilty. We affirm the conviction.

At trial the following facts were established. On the night of November 14, 1974, Juneau was subjected to a heavy rain and windstorm. Power went off for various periods throughout the city. The appellant, Lupro, attended a bachelor's party that night, which during the evening moved *en masse* from a private residence to the Juneau airport. Lupro was later ejected from the airport bar, and accompanied by a friend, Conrad Cerda, he returned to town in his Volkswagen Microbus van. Another friend who had been asleep or passed out in the back of the van made his presence known, and was taken home. Lupro was driving.

Lupro's story, which was disbelieved by the jury, was that after letting his passenger out he took Cerda to pick up the latter's truck, passing en route the intersection where the accident was to occur, and then parked his van in front of a bar. Cerda then picked up Lupro, and the two spent the rest of the evening riding in Cerda's truck and drinking beer. Cerda's testimony corroborated Lupro's account.

Lupro's van was later found outside of town, lying upside down at the bottom of a thirty foot embankment. It was taken into police custody and evidence later taken from the van firmly established that it was the vehicle that had struck the decedent.

The state sought to establish Lupro's guilt with circumstantial evidence. There was testimony indicating that Lupro was very intoxicated by the time he left the airport. At approximately 12:04 a. m. the decedent's co-workers left their place of employment and while so doing observed Jacobsen, alive drinking coffee.[1] Less than a minute later the witnesses saw a van discharge a passenger. They testified that it was making erratic stops and starts.[2] It was uncontroverted that at this point Lupro was operating the vehicle.

Other witnesses who were driving home from work testified that they saw a van leaving the scene of the accident seconds before they discovered the unconscious victim. The van was driving in the middle of the road without lights. Another vehicle arrived at the scene, and an ambulance was sent for. There was considerable testimony to the effect that the accident was reported and an ambulance dispatched at 12:09 a. m.[3]

Witnesses found the body lying approximately twenty to thirty feet[4] east of an intersection where there were stop signs. The body had been hit by a car travelling east. The victim's glasses were found twenty to thirty feet east of his body, having apparently been thrown that far by the impact of the vehicle.

The victim later died in a Seattle hospital, without regaining consciousness. The doctor who performed the autopsy testified that the victim had suffered the types of injuries associated with being hit by a vehicle travelling at a relatively high rate of speed.

1. They actually testified that they had left work at 12:14 a. m., but later testimony established that the clock upon which their testimony was based was ten minutes fast when it was checked the next morning.

2. This was explained by Lupro as being due to his unfamiliarity with the location of the apartments to which he was taking his passenger.

3. Evidence of the exact time was complicated by the fact that electric clocks were inaccurate due to a power failure. Time was established at trial largely by testimony concerning the time that power was restored.

4. One officer estimated the distance as forty-five to sixty feet.

## I

Lupro's defense was based in large part on his view that in order to sustain a conviction for negligent homicide the state would have to show not only that Lupro had been driving while intoxicated, but also that he had committed a particular act of negligence that proximately caused Jacobsen's death. In accordance with this view of the essential elements of negligent homicide, Lupro's counsel filed a motion for a bill of particulars pursuant to Criminal Rule 7(f).[5] The motion requested detailed information regarding all facets of the state's case including every fact to be proved by the state at trial, the names, addresses, telephone numbers and occupations of every witness to be called to prove those facts, and every item of physical evidence to be presented. The trial court denied this request and Lupro's attorney filed a second, more limited motion requesting the "overt acts" which the state intended to prove showing culpable negligence. This motion was also denied. Lupro contends that refusal to grant these motions effectively prevented him from finding out exactly what he was accused of and from preparing an adequate defense.

█ The purpose of a bill of particulars is to inform the defendant of the nature of the charges against him so that he may prepare a defense, to avoid prejudicial surprise at trial and to protect against a second prosecution for the same offense. *United States v. Addonizio*, 451 F.2d 49, 63–64 (3d Cir. 1972). The decision whether to grant the motion lies within the discretion of the trial judge. An abuse of discretion has been found where the defendant shows that he was actually surprised at trial and that his substantial rights were thus prejudiced. *United States v. Addonizio*, 451 F.2d at 64; *United States v. Bearden*, 423 F.2d 805, 809 (5th Cir. 1970); *see* 1 C. Wright, *Federal Practice and Procedure*, § 130 (1st Ed. 1969). Lupro · has failed to demonstrate prejudice.

█ The information requested in this first motion was, in effect, a request for discovery of the state's case *in toto* and went far beyond the proper scope of a bill of particulars. *See United States v. Armocida*, 515 F.2d 49, 54 (3d Cir. 1975). Lupro's second motion, although more limited in scope, was also properly denied. Lupro claims that without a bill of particulars he was unable to determine exactly what the state intended to prove at trial. But Lupro had full access to the grand jury testimony of the witnesses who later testified. He also had access to police reports, witness interviews and test results. The sole question is whether adequate knowledge of the charge was provided. It is not necessary that such knowledge be contained in the indictment if it was provided in some other form. *United States v. Schembari*, 484 F.2d 931, 935 (4th Cir. 1973); *United States v. Sullivan*, 421 F.2d 676, 677 (5th Cir. 1971). Lupro argues that it was precisely the voluminous nature of the material made available by the state that made it impossible to cull out what was important to the state's case and what was not. The record, however, does not support this position. The bases for the claims made by the state were clear from the grand jury testimony. We believe that Lupro had adequate forewarning of what the state intended to prove at trial.

## II

█ Applying his theory that an act of negligence separate from drunk driving is necessary to prove culpable negligence, Lupro challenged the sufficiency of the indictment. On appeal he breaks this down into essentially three claims: first, that count one of the indictment was facially insufficient because it failed to allege a necessary element of the offense charged; second, that insufficient evidence of negligence was

---

**5.** The Rule reads:

(f) *Bill of Particulars*. The court may direct the filing of a bill of particulars. A motion for a bill of particulars may be made before arraignment or within ten days after arraignment or at such later time as the court may permit. A bill of particulars may be amended at any time subject to such conditions as justice requires.

presented to the grand jury to sustain the indictment; and third, that the prosecution failed to instruct the grand jury as to the proper standards of negligence to return an indictment.[6]

> Count one of the indictment alleged: [t]hat on or about the 15th day of November, 1974, at or near Juneau, in the First Judicial District, State of Alaska, Robert F. Lupro did unlawfully, by his culpable negligence, kill another human being: to wit Elmer Johan Jacobsen, by striking him with a motor vehicle, a 1969 Volkswagen Microbus, Alaska License No. K–5432, of which he was the operator while and by driving under the influence of intoxicating liquor, all of which is contrary to and in violation of AS 11.15.080.

This statement is sufficient to meet the requirements of Criminal Rule 7(c), which provides in pertinent part:

> The indictment . . . shall be a plain, concise and definite written statement of the essential facts constituting the offense charged. . . . No indictment is insufficient . . . by reason of a defect or imperfection in matter of form in the indictment, which does not tend to prejudice the substantial rights of the defendant.

The indictment need not state every element of the charge necessary to be proved at trial. *State v. Thomas*, 525 P.2d 1092, 1094 (Alaska 1974); *Christian v. State*, 513 P.2d 664, 667 (Alaska 1973). Here count one informed Lupro of the statute he had violated, and that he was charged with killing the decedent by driving his Volkswagen Microbus in a culpably negligent manner while intoxicated. We find that the language of the indictment was adequate.

Lupro also contends that the indictment should have been dismissed because insufficient evidence was presented to the grand jury.[7] It is Lupro's position that no evidence was presented from which the grand jury could conclude that he was acting negligently at the time the decedent was hit by the van.

The standard for determining the sufficiency of evidence supporting a grand jury indictment is well settled:

> Where there is a challenge to the sufficiency of the evidence supporting the Grand Jury indictment, the question to be determined ". . . is whether the evidence presented a sufficiently detailed account of criminal activity and the defendant's participation in this activity so that 'if unexplained or uncontradicted it would warrant a conviction of the person charged with an offense by the judge or jury trying the offense.'"

*Newsom v. State*, 533 P.2d 904, 906 (Alaska 1975), *quoting Taggard v. State*, 500 P.2d 238 (Alaska 1972).

After reviewing the testimony we believe that even under Lupro's theory of the case, the grand jury heard sufficient evidence to sustain the indictment. Officer John Marshall testified that the victim's glasses had been thrown some twenty to thirty feet from his body, indicating that the victim had been hit by a vehicle going relatively fast. There was testimony that others driving that night were going ten to fifteen

---

**6.** Lupro also claims that improper evidence was admitted before the grand jury. We deal with this claim in a subsequent section of the opinion. Lupro also argues that the testimony of Hugh Macauley, an employee of the Alaska Electric Light and Power Company, was inadmissible hearsay under Criminal Rule 6(r). Macauley testified regarding the time when power was restored to Juneau during the storm that evening, an important indication of the exact time of the accident. His testimony was based upon a conversation between a Mr. Nagle and a Mr. Justice who were observing a clock. Even if it was hearsay however, Macauley's testimony was at most cumulative of testimony by several others on the same point. There was ample other evidence of the time of

the power restoration to allow the grand jury to conclude that Lupro was in the vicinity when the accident occurred. Any error was harmless. *Webb v. State*, 580 P.2d 295, 299–300 (Alaska 1978); *State v. Taylor*, 566 P.2d 1016, 1019 (Alaska 1977); *State v. Gieffels*, 554 P.2d 460, 462 n. 3 (Alaska 1974); *McKinnon v. State*, 526 P.2d 18, 27 (Alaska 1974); *State v. Johnson*, 525 P.2d 532, 536 (Alaska 1974).

**7.** This contention is based on Criminal Rule 6(q) which states in pertinent part: "The grand jury shall find an indictment when all the evidence taken together, if unexplained or uncontradicted, would warrant a conviction of the defendant."

miles per hour. The testimony also indicated that the van may have run a stop sign at the intersection, or at least made a very fast start. This evidence, coupled with the substantial evidence of Lupro's negligent driving immediately before and after the accident presented a sufficiently detailed account of Lupro's activity that, if uncontroverted, would warrant his conviction.

 Finally, Lupro attacks the indictment by claiming that the District Attorney failed to properly instruct the grand jury as to the necessary elements of negligent homicide. We think the instruction was adequate.[8]

### III

 Appellant's objection to the jury instructions at trial is also based upon his theory that a specific act of negligence in addition to drunken driving is necessary to warrant his conviction. Lupro claims that the giving of plaintiff's proposed instruction number nine[9] and the failure to give his own proffered instruction number six[10] were reversible error. Under instruction number nine the elements of the crime of negligent homicide did not require a specific finding of a particular act of negligence. The instruction merely required that the jury find that Lupro had killed Jacobsen "by his culpable negligence while and by driving a motor vehicle under the influence of intoxicating liquor." The state contends that jury instruction thirteen[11] clarified this by requiring a finding "not only that the defendant was operating or driving a motor vehicle while under the influence of

---

**8.** The prosecutor stated the following to the grand jury regarding negligent homicide:

There is one additional offense which the evidence conceivably suggests and that's found within Alaska Statute 11.15.080, and it is entitled Negligent Homicide and it reads as follows: "Every killing of a human being by the culpable negligence of another when the killing is not murder in the first or second degree, or is not justifiable or excusable, is manslaughter and is punishable accordingly. Under the law, it is not necessarily [sic] in a case that a person who can be charged and convicted of leaving a scene of an accident or failure to render reasonable assistance is also charged with negligent homicide. You must find that the killing of another person was a direct result of his, of the proposed defendant's, culpable negligence.

"Culpable negligence" has been defined as follows in the case law: "culpable negligence is something more than a slight negligence necessary to support a civil action for damages. Culpable negligence implies a reckless disregard of consequences, a needless indifference to the rights and safety and even the lives of others."

**9.** The instruction reads, in pertinent part:

The essential elements of the crime of Negligent Homicide as charged in Count I of the Indictment, each of which the State must prove beyond a reasonable doubt, are:

1. That on or about the 15th day of November, 1974, at or near Juneau, in the First Judicial District, State of Alaska,
2. The defendant, Robert F. Lupro
3. Did unlawfully kill Elmer Johan Jacobsen,
4. By defendant's culpable negligence while and by driving a motor vehicle under the influence of intoxicating liquor.

**10.** The proposed instruction reads, in pertinent part:

The essential elements of the crime of Negligent Homicide as charged in Count I of the Indictment, each of which the State must prove beyond a reasonable doubt, are: 1. That on or about the 15th day of November, 1974, at or near Juneau, in the First Judicial District, State of Alaska. 2. The defendant, Robert F. Lupro, 3. Did unlawfully, by his culpable negligence, 4. While and by driving a motor vehicle under the influence of intoxicating liquor, 5. Commit a negligent act or negligently failed to act, 6. Which act or failure to act proximately caused, 7. The death of Elmer Johan Jacobsen.

**11.** Jury instruction 13 provides:

You may not find that the defendant was culpably negligent from the mere fact that he was involved in an accident, nor may you find that he was culpably negligent from the mere fact that another human being died as a result of that accident.

In addition, before you can find the defendant guilty of negligent homicide, you must find not only that the defendant was culpably negligent, as defined in these instructions, but you must also find that such culpable negligence constituted the proximate cause of the death of Elmer Johan Jacobsen.

Driving or operating a motor vehicle negligently while under the influence of intoxicating liquor does constitute that degree of conduct of such a reckless, gross and wanton character as to indicate a heedless indifference to the rights, property, safety and even the lives of others. However, operating or driving a motor vehicle while under the influence of intoxicating liquor is not sufficient by itself to support a convic-

intoxicating liquor, but also that the defendant acted negligently and his conduct was a proximate cause of the death of Elmer Jacobsen." We agree. This instruction requires a finding not only that Lupro was operating his vehicle while intoxicated "but also" that he committed a negligent act. Moreover, we believe that the crime of negligent homicide is established upon proof that the accused was driving while intoxicated and that such act was the proximate cause of death. In order to establish culpable negligence the state must show a degree of conduct more wanton and reckless than that involved in ordinary negligence. *Stork v. State,* 559 P.2d 99, 101 (Alaska 1977); *DeSacia v. State,* 469 P.2d 369, 372 (Alaska 1970). In *Barbeau v. United States,* 193 F.2d 945, 949, 13 Alaska 551, 559 (1951), culpable negligence was defined as "a reckless disregard of consequences, a needless indifference to the rights and safety and even the lives of others." We believe that a person who drives while he is so intoxicated that he cannot control his actions falls within this definition. "One who is considerate of the rights of others does not drive while he is drunk." *State v. Montieth,* 247 Or. 43, 417 P.2d 1012, 1015 (1966). Where there is sufficient evidence that the driver was intoxicated at the time of the accident the state need only show beyond a reasonable doubt that the intoxication was the cause of the victim's death. There was thus no error in rejecting Lupro's proffered jury instruction.

This holding also answers Lupro's objection to jury instruction number twenty-seven, which listed eight statutes or regulations Lupro might have violated while he was driving that night. Lupro claims that this jury instruction created a danger of a non-unanimous verdict, in that it was possible for some but not all of the jurors to find a violation of one provision while others

found a violation of a different provision.[12] *See State v. Gaylor,* 12 Or.App. 544, 508 P.2d 250 (1973); *United States v. Gipson,* 553 F.2d 453 (5th Cir. 1973). We conclude, however, that there was no error. The state did not need to rely on a finding that one or more of the provisions had been violated. Before reaching a verdict of guilty it was necessary only that each juror find that the defendant had been driving while intoxicated and that this was the proximate cause of the accident.

## IV

After Jacobsen was discovered, the police began searching for the vehicle involved. They learned from witnesses that a Volkswagen, believed to be "greenish or dark blue or gray" had been seen leaving the area immediately after the accident. Shortly thereafter, an Alaska State Trooper, while searching on Basin Road, saw headlights shining at the bottom of a steep embankment. Upon investigating, the trooper discovered a dark colored van lying upside down. The trooper testified that after radioing the Juneau police he went down to the vehicle. Tire tracks at the top of the embankment led straight off the road, leading the trooper to conclude that the van had been deliberately pushed, instead of accidently driven over the side. This was corroborated by the fact that there was no evidence that anyone had been injured in the fall.

When officers from the Juneau police department arrived, a registration check on the license plate number showed the van was registered to Robert F. Lupro. The van was towed to a garage where it was impounded as evidence. The van was later towed to an impound lot. There, on November 20, 1974, one of the police officers conducted an examination of the outside of the vehicle to see whether any evidence of

tion for the offense of negligent homicide. Consequently, before you may find the defendant guilty of the offense of negligent homicide, you must find not only that the defendant was operating or driving a motor vehicle while under the influence of intoxicating liquor, but also that the defendant acted negligently and his

conduct was a proximate cause of the death of Elmer Johan Jacobsen.

**12.** Alaska Rule of Criminal Procedure 31(a) provides: "The verdict shall be unanimous. It shall be returned by the jury to the judge in open court."

the accident could be found. The officer discovered some fibers wedged in one of the windshield wipers. After removing the windshield wiper and examining it further the officer found additional fibers, glass particles and a dried substance which was apparently paint. Subsequent laboratory analysis of these items conclusively showed that Lupro's van had in fact been the vehicle that struck Jacobsen. Lupro objected to the introduction of this evidence, claiming that it had been seized in violation of his right to be free of unconstitutional searches and seizures.[13]

We have frequently held that warrantless searches and seizures are *per se* unreasonable unless they fit within a "few specifically established and well-delineated exceptions." *See, e. g., Zehrung v. State,* 569 P.2d 189, 192 (Alaska 1977); *Schraff v. State,* 544 P.2d 834, 838 (Alaska 1975); *McCoy v. State,* 491 P.2d 127, 132 (Alaska 1971). The state seeks to justify the seizure of the van by arguing that it had apparently been abandoned. Abandoned property is not subject to the warrant requirements of the search and seizure provisions. *Abel v. United States,* 362 U.S. 217, 241, 80 S.Ct. 683, 4 L.Ed.2d 668 (1968); *Schraff v. State,* 544 P.2d 834, 840 (Alaska 1975); *Smith v. State,* 510 P.2d 793, 795 (Alaska 1973).

In *Smith,* we analyzed the question in terms of whether the complaining party had intentionally relinquished any reasonable expectation of privacy in the articles alleged to be abandoned. *See also United States v. Colbert,* 474 F.2d 174, 176 (5th Cir.

1973); *United States v. Wilson,* 472 F.2d 901, 902 (9th Cir. 1972). We believe that in this case it was reasonable for the police officers who located the van to believe that it had been so abandoned, and that the seizure of the vehicle, to be held as evidence, was legal. The trial testimony showed that the van had gone straight off the embankment. An examination of the vehicle at the scene showed no signs that anyone had been inside the vehicle when it went off the road. This, when combined with the officer's prior knowledge that the van may have been involved in a serious crime, was more than sufficient to allow the inference that the van had been deliberately pushed over the side of the hill. The police officers were further justified in concluding that no reasonable expectation of privacy existed. *Smith v. State,* 510 P.2d 793, 796–97 (Alaska 1973); *Katz v. United States,* 389 U.S. 347, 351–52, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The van could be seen from the roadside, even at night. It had obviously gone off the road. It would be unreasonable to expect that such an occurrence would not be investigated, and that the van would not eventually be inspected to see what had happened.

The continued holding of the van after its initial seizure was justified under AS 28.35.070,[14] which authorizes the police to impound any vehicle which may have been involved in an accident if there is a possibility that it will be repaired, and to prevent access to the vehicle to anyone except investigating officers. The police had cause to believe the van had been involved

---

**13.** U.S.Const. amend. IV; Alaska State Const. art: 1, § 14.

**14.** The statute provides:

*Examination or impounding before repair.* No person may make or have made repairs to damage or injury to a motor vehicle which could have been caused by collision with a person or property without first notifying the Department of Public Safety, chief of police, or in the absence of these, the nearest policeman or other peace officer, who shall immediately examine the vehicle and make a full report subscribed by the person in whose custody the vehicle then is. A copy of the report shall be mailed or delivered to the Department of Public Safety. If no official is within 10 miles of the

place where the vehicle is brought for repair, then no notice or examination is required. If there is ground for suspecting that the vehicle was involved in a collision with a person, the vehicle shall be impounded at the expense of the owner, for which the custodian shall have a lien, and shall be accessible only to officers detailed to the investigation of the case until released. If, however, there is no reason to suspect that the damage to the motor vehicle was caused by collision with a person or property, the repair of the vehicle may be authorized by the officer in charge of the investigation at any time after the expiration of 24 hours thereafter.

in the death of Elmer Jacobsen, based on eyewitness descriptions immediately before and after the accident took place. It would have been quite easy for evidence to have been removed or destroyed on purpose or inadvertently if the vehicle had been returned to Lupro. The fact that the police did not have a warrant for the initial seizure is irrelevant. Having properly gained possession of the vehicle under the abandoned property exception to the warrant requirement, they could constitutionally retain and safeguard the evidence in their possession. *See Cooper v. California,* 386 U.S. 58, 61–62, 87 S.Ct. 788, 790–791, 17 L.Ed.2d 730, 733–734 (1967).

▆ The final question is whether the inspection of the van and the removal of evidence on November 20 was in violation of Lupro's constitutional rights. We believe that the police, having the van properly in their possession, could inspect its exterior for evidence without a warrant. The items objected to include the fibers, glass particles, and paint found on the windshield wiper.[15] The windshield wiper of a motor vehicle is normally exposed to the public at large. Indeed traffic citations, notices, and other announcements are frequently placed there. There could thus have been no reasonable expectation of privacy in the area from which the evidence was taken.

We find the principles expressed in *Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974), to be applicable here. In *Cardwell,* the Supreme Court upheld the taking of paint scrapings and tire impressions from the defendant's vehicle after it had been lawfully impounded.[16] The Court reasoned:

In the present case, nothing from the interior of the car and no personal effects, which the Fourth Amendment traditionally has been deemed to protect,

were searched or seized and introduced in evidence. With the "search" limited to the examination of the tire on the wheel and the taking of paint scrapings from the exterior of the vehicle left in the public parking lot, we fail to comprehend what expectation of privacy was infringed. Stated simply, the invasion of privacy, "if it can be said to exist, is abstract and theoretical." *Air Pollution Variance Board v. Western Alfalfa Corp.,* 416 U.S. 861, 865, 94 S.Ct. 2114, 40 L.Ed.2d 607 (1974). Under circumstances such as these, where probable cause exists, a warrantless examination of the exterior of a car is not unreasonable under the Fourth and Fourteenth Amendments.

417 U.S. at 591–92, 94 S.Ct. at 2470, 41 L.Ed.2d at 335–36 (footnotes omitted).

In summary, we believe that the police could validly seize the van under the reasonable assumption that it had been abandoned. They had a right as well as a statutory duty under AS 28.35.070 to hold the van as evidence. This was justified by the need to prevent evidence from being purposefully or inadvertently destroyed. Since the van was lawfully in their possession, they were entitled to inspect the exterior. The evidence found during that inspection was properly admitted at trial.

V

Lupro's next specification of error is that the trial court improperly allowed impeachment of his alibi witness, Conrad Cerda, by evidence of Cerda's heroin usage and other "bad acts."[17] Criminal Rule 26(a) provides: "The admissibility of evidence shall be governed by Civil Rule 43 and by these rules, or in the absence of rule, by the principles of common law . . . ." Civil Rule 43(g)(11)(b) provides:

**15.** In addition, Lupro sought at trial to suppress paint chips and glass particles taken from the front of the van by a police fingerprint expert. These items were not discussed by Lupro in his brief, but would not alter our conclusion in any event.

**16.** The automobile was seized from a public parking lot. The court found that the mobility

of the car and its accessibility to others were exigencies justifying the seizure. 417 U.S. at 594–95, 94 S.Ct. at 2471–2472, 41 L.Ed.2d at 337.

**17.** The prosecution also asked questions about an alleged suicide attempt and an alleged theft in the course of the general impeachment about heroin use.

A witness may be impeached by the party against whom he was called by contradictory evidence, or by evidence that his general reputation for truth is bad, or that his moral character is such as to render him unworthy of belief. He may not be impeached by evidence of particular wrongful acts except . . . that the witness has been convicted of a crime.[18]

It is undisputed that Cerda had never been convicted of a crime because of his use of heroin.

In *Fields v. State,* 487 P.2d 831, 844 (Alaska 1971), this court held that evidence of drug usage is not admissible where its only purpose is to impeach a witness by showing that he is, by sole virtue of his addiction, inherently unreliable. We noted, however, that evidence of drug usage may be admitted under certain circumstances.

Where evidence of addiction tends to show that the witness was under the influence of narcotics either at the time of trial or at the time of the occurrence to which he testifies, where the evidence proves his ability to perceive, remember, and testify are substantially affected by his habit, or where such evidence would be independently admissible under some other theory, it should not be excluded.

*Id.* at 844–45.

■ The state advances several theories which purportedly justify the admission of the evidence of heroin usage. The first is that the evidence was admissible because Cerda could have been under the influence of heroin when the accident occurred. "Cross-examination is permissible to show that the witness was under the influence of a drug as the time of the events to which he is testifying." *Doe v. State,* 487 P.2d 47, 58

(Alaska 1971). However the state did not limit its questioning to the night of the accident. The district attorney made an extensive examination into the history of Cerda's drug use in general. The questioning went far beyond anything justified by the need to determine Cerda's state of mind during the relevant time period.

■ The state also contends that the evidence of heroin use was admissible because it tended to show bias on Cerda's part. *See Evans v. State,* 550 P.2d 830, 839 (Alaska 1976); *McKay v. State,* 489 P.2d 145, 149 (Alaska 1971); *Fields v. State,* 487 P.2d at 845. The state argues that "if he possessed heroin on the night of November 14 and the early morning hours of November 15, 1974, he had an interest in not being at the scene of the accident of the nature involved in the instant case, and he had an interest in not being questioned by the police." This does not justify the extensive questioning outside the relevant time span, however. We have permitted evidence to show bias where, for example, the witness was a police informant who was testifying to avoid his own prosecution. *See R.L.R. v. State,* 487 P.2d 27, 44 (Alaska 1971); *Whitton v. State,* 479 P.2d 302, 316 (Alaska 1970). In *McKay,* 489 P.2d at 148, the prosecution was allowed to question a defense alibi witness about his indictment for selling narcotics to the same undercover agent who was testifying against the defendant. The possible bias was obvious: by discrediting the agent the witness was buttressing his own defense. In contrast, the reasons advanced by the state in this case are purely speculative. No evidence was ever produced showing that Cerda had drugs in his possession on the night of the accident.

**18.** Cerda was actually called by the state. Civil Rule 43(g)(11)(a) provides:

The party producing a witness may not impeach his credit by evidence of bad character. He may contradict him by other evidence; and he may show that he has made at other times statements inconsistent with his present testimony . . . . .

Cerda was treated as a "hostile" witness by the state at trial however, and this issue has been

briefed as though he had been a defense witness. We agree with the court below that for purposes of this appeal, the standard for determining if evidence of "bad acts" under Civil Rule 43(g)(11)(b) was improperly admitted is the same as the standard for determining if evidence of "bad character" was admitted under 43(g)(11)(a) (current version at Rules of Evidence 608(b)); Civil Rule 43 (repealed August 1, 1979).

■ The state's third theory is that by introducing evidence of Cerda's "prior good acts," the defendant opened the door for rebuttal by the introduction of prior "bad acts." The only case cited for this proposition is *State v. Riconosciuto,* 12 Wash.App. 350, 529 P.2d 1134 (1974). However, *Riconosciuto* involved a *defendant* who had testified to his own good conduct. The case involved grand larceny. After the defendant testified about his business successes, the state was allowed to question him about income tax evasion. Even if this case were to apply to a witness, a point which we do not decide, there was no justification for the questioning that actually took place. The transcript reveals that the "bad character" testimony far exceeded the scope of the "good character" testimony. The questioning by the prosecutor does not in fact appear to have been a good faith attempt to rebut Cerda's statements.[19]

■ Although we find that the impeachment testimony should not have been allowed, after carefully reviewing the record we hold that the error was harmless under Criminal Rule 47(a).[20] The standard for harmless error in the context of inadmissible evidence was set forth in *Love v. State,* 457 P.2d 622 (Alaska 1969):

> It is the impact on [the juror's] minds which is critical in determining whether an error impaired or affected the substantial interest of the defendant in having a fair trial. . . .
>
> "The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."

457 P.2d at 630–31, *quoting Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

Lupro's defense rested on an alibi. His story was that he had dropped his passenger off and, after letting Cerda get his truck, parking the van, and fixing a door which had been broken earlier in the evening, had continued his drinking elsewhere in Cerda's truck while someone stole his van and drove it back to where the accident occurred. The state's case rested on showing that there was simply not enough time for these events to have occurred between the time Lupro was seen dropping his passenger off and the time the accident was reported. Although Cerda corroborated Lupro's story, the evidence that the accident was discovered at 12:09 a. m. was overwhelming, making Lupro's story highly improbable.[21] Moreover, Cerda's testimony as to time was thoroughly contradicted by others, including Lupro. The trial court found that "by the judgment of reasonable persons it is highly improbable that any other conclusion could have been reached than was established in this case, and one can have little, if any, doubt that the judgment was not substantially affected by the error." We agree with this assessment.

## VI

Lupro's final challenge is to the jury that was selected to hear his case. The state challenged three potential jurors for cause

---

**19.** We note that Alaska Rule of Evidence 608(b) states in pertinent part that:

> Evidence of other specific instances of the conduct of a witness offered for the purpose of attacking or supporting that witness' credibility is inadmissible unless such evidence is explicitly made admissible by these rules, other rules promulgated by the Alaska Supreme Court or by enactment of the Alaska Legislature.

The commentary to the rule explains that the rule "follows Alaska R.Civ.P. 43(g)(11), superseded by this Rule, and a trend in some jurisdictions to prohibit impeachment by 'bad acts' other than criminal convictions."

**20.** The Rule provides:

> Any error, defect, irregularity or variance which does not affect substantial rights [of the parties shall] be disregarded.

**21.** The only contradictory evidence was from several of Jacobsen's co-workers who testified that they saw Jacobsen alive when they left work at 12:14 a. m. This discrepancy was explained by testimony showing that the clock the co-workers had judged their time by was ten minutes fast that night.

under Alaska Rule of Criminal Procedure 24(c)(11), which allows challenges on the ground that "the person is or has been a party adverse to the challenging party or attorney in a civil action, or has complained of or been accused by him in a criminal prosecution." The potential jurors had previously been charged with crimes. Two of them had been convicted.[22]

■ Lupro first contends that the trial court erred in interpreting the rule broadly. He argues that the rule must be construed to allow challenges by a district attorney only where the attorney was personally involved in the case affecting the juror. We agree with the trial court that the plain language of the rule does not permit such a narrow reading. The rule permits challenges where either the party or the party's attorney have accused the potential juror in a criminal prosecution. Here the state was a party to the criminal proceedings. It was not necessary that the district attorney have personally participated in order to invoke the rule.

■ The next question is whether this interpretation of the rule deprives Lupro of his constitutional right to a jury that is representative of the community.[23] In order to do so, the rule must operate in a way which would exclude from the jury some cognizable group or class of citizens in the community. *Hampton v. State,* 569 P.2d 138, 148 (Alaska 1977); *Alvarado v. State,* 486 P.2d 891, 898 (Alaska 1971); *Green v. State,* 462 P.2d 994, 997 (Alaska 1969). In *Hampton,* we defined such a group to be one with a "definite composition," "a basic similarity in ideas, attitudes or experience" and a "community of interests which cannot be adequately protected by the rest of the populace." 569 P.2d at 148, *quoting United States v. Guzman,* 337 F.Supp. 140, 143–44

(S.D.N.Y.) *aff'd* 468 F.2d 1245 (2d Cir. 1972). In *Green v. State,* 462 P.2d 994, 999 (Alaska 1969), the court upheld the constitutionality of the use of voting lists to select potential jurors, stating:

There has been no showing that those who do not vote represent a cognizable group of persons constituting a particular economic, social, religious, racial, geographical or political group in the community, and that the effect of using voter lists amounts to a systematic and intentional exclusion of any such group from jury service.

*See also Webb v. State,* 580 P.2d 295, 297–98 (Alaska 1978); *Smiloff v. State,* 579 P.2d 28, 30–31 (Alaska 1978).

Under these authorities, Lupro has not demonstrated that the jury that convicted him was not a fair cross-section of his community. We note that people who may be accused of a crime come from all walks of life and from all economic, social and religious backgrounds. Although all have had the common experience of having been, at one time or another, in opposition to the state, the appellant has made no showing that this alone is sufficient to give them the cohesion or the "basis similarity in ideas, attitudes or experience" that would make their exclusion from the jury a violation of Lupro's rights.[24]

AFFIRMED.

CONNOR, Justice, dissenting, with whom RABINOWITZ, Justice, joins.

I concur with the majority opinion except with the portions dealing with the standard of culpably negligent conduct and the related jury instructions. With respect to those portions, I respectfully dissent.

---

**22.** One of the three was also challenged because of her extensive financial dealings with the appellant's father.

**23.** The sixth amendment of the United States Constitution provides:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . . .

Article I, section 11 of the Alaska Constitution contains similar language.

**24.** As a matter of policy we do have doubts as to the wisdom of Rule 24(c)(11). Read literally its sweep seems too broad, for its subjects anyone who has ever been a litigation adversary to the state to a challenge for cause. We shall request comments on the rule from our Criminal Rules Revision Committee.

## I

The majority opinion states that driving while intoxicated, without more, is sufficient to sustain a conviction for negligent homicide. But culpable negligence requires "a degree of conduct more reckless and wanton than would be involved in ordinary negligence . . . ." *De Sacia v. State*, 469 P.2d 369, 372 (Alaska 1970). Although driving after excessive drinking may in fact supply the element of recklessness to raise that behavior to the level of culpable negligence, driving after drinking moderately may constitute no negligence at all if the driver is exercising due care. This distinction between recklessness and ordinary negligence has long been recognized in the law. *See* J. Hall, General Principles of Criminal Law (2d ed. 1960), 127–28; R. Perkins, Criminal Law (1957) 60–64; Hall, Negligent Behavior Should Be Excluded From Penal Liability, 63 Colum.L.Rev. 632 (1963). I see no reason for this court to blur that distinction, thus causing confusion about the applicable legal standard.[1]

Unlike negligence, recklessness depends upon a *subjective* evaluation of defendant's conduct. As Professor Hall noted:

Recklessness no less than intention includes a distinctive state of awareness. To ascertain whether recklessness existed, we must determine the actor's knowledge of the facts and his estimate of his conduct with reference to the increase of risk. In the determination of these questions the introduction of the "reasonable man" is not a substitute for defendant's awareness that his conduct increased the risk of harm any more than it is a substitute for the determination of intention, where that is material . . . . [U]nless it is determined that the defendant knew he was increasing the risk of harm, it cannot be defensibly held that he acted recklessly.

J. Hall, General Principles of Criminal Law 120 (2d ed. 1960).

The highest courts of other states have maintained this distinction between culpably negligent conduct and driving while under the influence of intoxicating liquor, holding that driving while intoxicated is a factor to be considered by the jury in assessing a defendant's conduct in negligent homicide cases, but is not itself sufficient to convict without other evidence of wanton or reckless conduct. *Smith v. State*, 65 So.2d 303 (Fla.1953); *Cutshall v. State*, 191 Miss. 764, 4 So.2d 289 (1941); *State v. Sisneros*, 42 N.M. 500, 82 P.2d 274 (1938). "It is not the fact but the effect of the intoxication which is relevant." *Cutshall v. State, supra,* 4 So.2d at 292. These cases are still good law. *See e. g., Grantham v. State*, 358 So.2d 878 (Fla.App.1978); *Murray v. State*, 329 So.2d 349 (Fla.App.1976); *Gant v. State*, 244 So.2d 18 (Miss.1971); *Jones v. State*, 244 Miss. 596, 145 So.2d 446 (1962); *Smith v. State*, 197 Miss. 802, 20 So.2d 701 (1945). In several other jurisdictions the highest courts have carefully delineated the offenses of driving while under the influence of intoxicating liquor and reckless driving, holding that the fact of violation of a statutory prohibition (including driving under the influence) does not in and of itself warrant the bringing of a charge of recklessness. *State v. Lunt*, 106 R.I. 379, 260 A.2d 149 (1969); *State v. Hargis*, 5 Conn.Cir. 231, 249 A.2d 663 (1968); *State v. Licari*, 132 Conn. 220, 43 A.2d 450 (1945).

I do not suggest here that driving while under the influence can never constitute culpably negligent conduct, but rather that a range of effects upon driving behavior can result from drinking, and that a drinking driver can in fact exercise due care.

---

1. I have found only one case that supports the majority, *State v. Kellison*, 233 Iowa 1274, 11 N.W.2d 371 (1943), in which the Iowa court held that driving while intoxicated resulting in death is "malum in se . . . and is clearly an unlawful act within the definition of manslaughter." *Id.* 11 N.W.2d at 373. The majority cites *State v. Montieth*, 247 Or. 43, 417 P.2d 1012 (1966), to support this standard, but the Supreme Court of Oregon actually held instead that "Where the state produces evidence of [driving while intoxicated], *together with* any act of negligence causing death, there is sufficient connection between the drunkenness and the negligence to constitute gross negligence." [emphasis added] *Montieth*, 417 P.2d at 1015. This standard of culpable negligence was argued for by Lupro.

There is a spectrum of impairment possible from ingestion of the same relative amount of alcohol, depending on the individual's "capacity," recent food consumption, emotional state, etc. *See e. g.*, Havard, "Alcohol in Relation to Road Traffic," Gradwohl's Legal Medicine, ch. 37 (2d ed. 1968). The statutory level of .10% blood alcohol gives rise only to a presumption that a person's driving skills have been affected by his drinking. AS 28.35.033(a)(3). That the defendant in a negligent homicide case may have been drinking prior to the victim's death cannot transform conduct which is non-negligent or merely negligent into conduct which is culpably negligent.

## II

In my opinion jury instructions No. 9 and No. 13 constitute error because they set forth different standards of culpably negligent conduct, creating the danger of a non-unanimous verdict. Instruction No. 9 would allow the jury to convict Lupro of negligent homicide solely for the act of driving while intoxicated. Instruction No. 13 sets a different standard of culpable negligence that requires "driving . . . a motor vehicle negligently in addition to driving while intoxicated." (*Id.*, para. 3) Together, these instructions create the possibility of confusion among the members of the jury as to which standard the court intended. There could have been significant disagreement among the members of the jury as to what Lupro did. Because these instructions may have judicially sanctioned a non-unanimous verdict, Lupro's conviction should be reversed.

Instruction No. 13 was also prejudicial to Lupro because of the internal contradiction created by references first to "culpable negligence," and thereafter to "negligence" (meaning, presumably, ordinary negligence) within that instruction. It states that, to find the appellant culpably negligent, the jury need find *only* that he was "driving

. . . negligently" and that he "acted negligently." (*Id.*, para. 3) In a recent negligent homicide case, we held that it was reversible error to omit the word "culpable" from the instruction defining negligent homicide. *Stork v. State*, 559 P.2d 99 (Alaska 1977). Appellant here has been similarly prejudiced. In my view, the instructions as given constitute plain error.

## III

I concur with the majority opinion that Instruction No. 27 does not create a danger of a non-unanimous verdict, if, as it assumes, the act of driving while under the influence of intoxicating liquor is alone sufficient to sustain the conviction. Assuming *arguendo* that culpably negligent conduct requires an act of a reckless character, and that driving while intoxicated is simply one factor to be considered in assessing Lupro's conduct, I, too, do not reach the issue of a non-unanimous verdict, since none of the acts listed in Instruction No. 27, with the exception of the charge of reckless driving, would in itself constitute culpable conduct. There remains, however, the very real possibility that the jury was thoroughly confused by the giving of this superfluous instruction.[2]

For these reasons, I believe the conviction should be reversed and the case remanded for a new trial. In all other respects I concur with the majority opinion.

---

**2.** It is only if the standard of negligent conduct is driving while intoxicated plus an act of ordinary negligence that the issue of the non-unanimous verdict arises. In that case, the jurors must agree on which act or acts of ordinary negligence were committed by the defendant. The selection of any of several alternatives by each member of the jury is not enough. *U. S. v. Gipson*, 553 F.2d 453 (5th Cir. 1977).